This is a proceeding in rem — a caveat to the will of Cornelius R. Williams — under N.C. Code, 1935 (Michie), sec. 4159, etc. Williams left surviving him his widow, Daisy Williams, and the following heirs at law: W. H. Williams, Charlie Williams, Charlotte Byrd, and Jane Taylor; Mack Williams, now deceased, who left the following children: Edith Williams, Lula Williams, Troy Williams, Minnie Williams, Mae Williams, Faye Williams, and Thelma Williams, who are infants, and W. D. Adkins was appointed their guardian ad litem. Citation was duly issued for all the heirs at law of C. R. Williams and devisees and legatees under the purported will. In the caveat proceedings the record discloses "W. H. Williams, Charlie Williams, Charlotte Byrd and Jane Taylor, caveators, respectfully show to the Court," etc.
Jane Taylor and Charlotte Byrd for answer to the caveat say, in part: "These heirs at law of the late Cornelius Williams declare that the paper writing filed with the clerk of this court is the true and proper *Page 261 
will of their brother, Cornelius R. Williams, and each and every part of said will is in his own handwriting. That neither of these respondents ever authorized anyone to file a caveat to said will in their behalf, and now repudiate the said caveat so far as it relates to them. . . . It is not denied that W. H. Williams and Charlie Williams are brothers and Charlotte Byrd and Jane Taylor are sisters of the late Cornelius R. Williams. . . . That each, every and all of the allegations contained in paragraph 6 of the caveat are untrue, as these answering respondents are advised, and said allegations are denied. That these answering respondents verily believe the document in question to be the last will and testament of their brother, as he in his life time informed these respondents of his intention to leave his property just exactly as set out in the will. . . . These respondents being desirous that the true intention of their brother be carried out, pray that the court declare the document filed in the office of the clerk of the Superior Court, and purporting to be the last will and testament of their deceased brother, be declared to be his last and final testament and that he had sufficient mental capacity to execute the same, and that the same and every part thereof is his last will and testament."
Daisy Williams, the widow's answer, in part, says: "That each and all the allegations set forth in paragraph 6 of the caveat are untrue and therefore denied, except it is admitted that on the 23rd day of March, 1937, Daisy Williams presented herself before the clerk of the Superior Court of Yancey County and was appointed administratrix of the estate of her deceased husband, and at that time she did not know of the existence of his will or that he had ever made a will, and she, in absolute good faith, qualified as administratrix, but a few days after having qualified she found the paper writing which she later filed as the will of her late husband, Cornelius R. Williams. That after having been appointed administratrix as aforesaid, this answering respondent was advised that she should look through all the papers of her deceased husband and see if a will could be located. That pursuant to such advice she, in the presence of J. Will Higgins, her brother, Rex Miller and Brown Williams, went through all the papers of her late husband and found the paper writing which she afterwards presented to the clerk of this court and had same probated as the will of her late husband, and she surrendered her letters as administratrix, and the order appointing her administratrix was thereupon stricken out and annulled, and that each and every word and figure in said paper writing is in the handwriting of her deceased husband, and is in the exact form in which it was found, and was found among the valuable papers of her late husband, Cornelius R. Williams. In further answer to paragraph 6 of the caveat, this answering respondent says that on the 11th day of March, *Page 262 
1937, her husband complained of being ill, and went to the hospital in Asheville on the 17th day of March, and there was never a moment, in the opinion of this affiant, before March 12th, on March 12th and after March 12, 1937, when her husband was not in full possession of his mental faculties, thoroughly understood and comprehended everything he was doing, and the same condition on the part of her husband continued until his death; that he was physically able to write, and the paper writing exhibited as his will is in his own proper handwriting. And further, that up until the time he was taken to the hospital he was able to write. And further answer to paragraph 6, this answering respondent says that the disposition of the property under the will of C. R. Williams corresponds precisely as the said C. R. Williams had indicated several times to this answering respondent and to others, with the manner in which he desired to dispose of his property. Wherefore, this answering respondent prays the court for a judgment declaring the paper writing which has already been probated in common form, to be the last will and testament of the said C. R. Williams, her late husband, and that the same be probated in solemn form."
W. D. Adkins, guardian ad litem of Edith Williams, Lula Williams, Troy Williams, Minnie Williams, Mae Williams, Faye Williams and Thelma Williams, who, for answer to the caveat in this cause, says: "That in answer to paragraph 6 of the caveat, this guardian ad litem says that he has made an investigation and has examined the paper writing referred to as Exhibit `A' and designated as the last will and testament of Cornelius R. Williams; that he has examined various papers bearing the signature of Cornelius R. Williams, and which the guardian ad litem verily believes to be the signature of the said Cornelius R. Williams, and having often seen the said Williams write and knowing his signature; and therefore this guardian adlitem avers that the said paper writing is the last will and testament of the said Cornelius R. Williams, and the allegations of paragraph 6 of the caveat inconsistent with the allegations contained in this paragraph are hereby denied. This guardian ad litem avers, however, upon information and belief, that the said Daisy Williams was appointed administratrix before she knew that any will existed and before the last will and testament of Cornelius R. Williams was found among his valuable papers. It is denied that the said Cornelius R. Williams was so sick and incompetent that he did not have sufficient mental capacity to execute said will, but, on the contrary, this guardian ad litem is advised, informed and verily believes, that the said Cornelius R. Williams was rational up until his death. That this guardian ad litem, before filing answer in this cause, made an investigation of the matters in connection with the last will and testament of Cornelius R. Williams in order that he might be in position to protect *Page 263 
the interests of the said minors, and this answer is the only answer that said guardian ad litem can in good conscience file in said cause. This guardian ad litem prays the court for a judgment declaring said paper writing referred to as Exhibit `A' to be the last will and testament of the said Cornelius R. Williams and that said guardian ad litem recover the costs in this behalf incurred."
The purported will is as follows: Exhibit "A." "I, C. R. Williams, do hereby will and bequeath to Daisy Williams my wife all my personal property to use as her own. I also will and bequeath to Daisy Williams my wife all my real estate as long as she lives. At her death the real estate is to be divided between Brown Williams and Coy Williams equal. Give Coy Williams the place known as the School House place. Give Brown Williams the home place. Divide the mountain place equal between them. I request Daisy Williams my wife to pay Jane Taylor the amount due her as shown on my account book. Also pay Rexter Miller $100.00 one hundred dollars that I owe him. To this I set my hand and seal March 12th, 1937. C. R. Williams."
The evidence of the propounders was to the effect that the purported will of Cornelius R. Williams was made on 12 March, 1937. Dr. I. W. Bradshaw, an expert physician who had been the family physician for some twenty years and attended him in his last illness, testified, in part: "He went to the hospital about 16th or 17th of March. I have an opinion satisfactory to myself at the time I saw him and think his mental condition was good. At all times that I saw him I think he had physical and mental capacity sufficient to understand that he was making a will, and the manner in which he was disposing of his property and to whom it was going. (The 12th of March, the day on which the purported will was signed, was on Friday). His temperature was 100 1/2 or somewhere along there. The way that I recall it is that on March 12th, according to the calendar, I saw him lying on the bed with his clothes on down here in Ramsaytown."
J. Will Higgins testified, in part: "Well, I think I know the handwriting of C. R. Williams. I have often seen him write. To the best of my knowledge that paper, the signature to it and the body of it is in Neely Williams' handwriting. C. R. Williams and Neely Williams is the same man. Well, I imagine that I lived 400 or 500 yards from him, just across the river. I lived that close to him 18 years. . . . I went over there and she (Daisy Williams) requested me to go through the papers with her and she brought out a drawer; I don't know whether it was a washstand, bureau or what it was, and set it down at my feet and I was going through each separate parcel and examining the papers, and I found a bunch of deeds, this envelope was in there with it and four or five deeds in it; and I called over a receipt which Mr. Williams *Page 264 
had given his sister Jane Taylor. I called over that, and went over these receipts and the papers, and finally I told her I had found a will, and I don't think I went any further with the papers."
Richmond Bennett testified, in part: "I knew C. R. Williams, commonly known as Neely Williams. I knew him for something like 25 years. I have often seen him write. The paper writing handed me purporting to be his last will and testament and every part thereof, in my opinion, looks to be in his handwriting. Yes, the writing, as I said, compares with his handwrite."
Mr. Scott testified, in part: "I am cashier of the local branch of the Northwestern Bank, and have been for a total of more than 18 years. During that time I have had opportunity to compare and scrutinize handwritings. I could give an opinion satisfactory to myself upon comparison of handwritings as to whether or not it is written by the same man. . . . In my opinion these papers are in the same handwriting. "
Daisy Williams testified, in part: "I am the widow of Neely Williams, and I lacked from the 18th of March until the 9th of September being married 20 years. At the time of his death, Coy Williams, Brown Williams, my husband and myself composed our household. Coy Williams and Brown Williams are the same Coy Williams and Brown Williams named in the will. Brown Williams has lived in our home for more than 5 years. We took Coy Williams when he was seven years old, took him on the 18th of December, 1927, and he is still a member of our family, but is in the army now. After my husband's death Coy went to the army. I think I know my husband's handwriting. He was postmaster at Ramsaytown at the time of his death. I have an opinion satisfactory to myself as to whose handwriting the signature and every part of the paper writing you hand me is; it is my husband's. . . . I sent for Squire Higgins. When he came in the room Rex told me to get the papers and I got the drawer that he kept his papers in and brought it to him. I never saw the paper that I hold in my hand until before Squire Higgins took it out of the drawer. . . . He (C. R. Williams) became sick in his last sickness on the 11th day of March, 1937. And he went to the hospital on the 17th of March. Dr. Bradshaw came to see him on the 12th of March. That was Friday and he came on Sunday the 14th. I took him to the hospital on the 17th, and he died on the 18th of March. I don't know of any time prior to the date of his death that my husband never had sufficient mental capacity to know what he was doing if he signed a paper writing (a will) and that he was actually disposing of his property, to whom he was disposing and what he was disposing. On the 12th of March my husband stayed in the postoffice; he was up and down but didn't attend the postoffice; he told me *Page 265 
Friday morning to get him some clean overalls and clean shirt so he could lie on the bed, so he was up and down all day. I attended the postoffice that day, and that required that I be away from the house a great deal of the time. I didn't know anything about his having left a will. The drawer that Mr. Higgins went through had a whole lot of different kinds of papers, this will in it, and some receipts for one thing that I know of. These papers that you have shown to witnesses were in the same drawer where the will was and some were not. I have looked over the sales tax receipts that have been shown to witnesses."
W. H. Williams, a witness for caveators and a brother of C. R. Williams, testified, in part: "I had often seen my brother C. R. Williams write his name. I think I know his handwriting pretty well. I have seen his signature to papers often. I have an opinion satisfactory to myself as to whether the name to the paper you show me is the signature of my brother C. R. Williams or not. My opinion is that it is not his signature. I have seen him write from time to time since he was small. Ever since he was a small boy." On cross-examination, he testified: "I asked you if the C. on the check is similar to the C. on the will? Ans.: It is a little bit similar to it. Q. How does the signature on the check compare with the signature on the purported will? Ans.: There is a little bit of similarity. Q. Mr. Williams, I will ask you to look at this check (check and will handed witness) and ask you if these two signatures are not similar? (Objection.) (Another check handed witness.) Mr. Williams, do you have an opinion satisfactory to yourself as to whose signature appears on the paper writing I hand you? Ans.: It appears similar. By the court: You didn't answer his question. Q. Do you have an opinion satisfactory to yourself as to whose signature appears on the paper writing I hand you? Ans.: Just like I tell you, the R. and the rest — (Interrupted by the court) — By the court: State whether or not you have such an opinion, Mr. Williams, and if you do say so, and if you don't say so. Q. And then you can make your explanation — what is your opinion? By the court: The question is do you have such an opinion? Ans.: I couldn't say point blank just whose, but it might be his. By the court: There is just one answer to that question and that is `Yes' or `No' as whether or not you have such an opinion. Ans.: Yes, it must be his signature, but I never saw him sign a C. like that." Later W. H. Williams testified, speaking of the will: "I don't believe that it is his handwriting." He further testified, "Jane Taylor and Charlotte Byrd were not here when I filed a caveat, but they agreed to it before I filed it."
Mr. Edwards testified to the effect that on March 11th, the day before the purported will was dated, the deceased, C. R. Williams, sent a special delivery letter to the wrong place, and upon inquiry about it by Edwards, *Page 266 
he told him that he might have made that mistake, that he was suffering so that he didn't know what he was doing, or words to that effect. The caveators elicited from one of the witnesses offered by the propounders, Mr. Lyon, the opinion that the writing appearing at the end of the paper writing purporting to be the will is not the signature of Mr. Williams.
The issue submitted to the jury and their answer thereto were as follows: "Is the paper writing propounded by Mrs. Daisy Williams, and every part thereof, the last will and testament of Cornelius R. Williams? Ans.: `Yes.'"
The court below rendered judgment on the verdict. The caveators made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and necessary facts will be set forth in the opinion.
In the present proceeding we are dealing with what is termed a holograph will — a creature of statute — N.C. Code, 1935 (Michie), sec. 4144 (2), which is as follows: "Wills and testaments must be admitted to probate only in the following manner: . . . (2) In the case of a holograph will, on the oath of at least three credible witnesses, who state that they verily believe such will and every part thereof is in the handwriting of the person whose will it purports to be, and whose name must be subscribed thereto, or inserted in some part thereof. It must further appear on the oath of some one of the witnesses, or of some other credible person, that such will was found among the valuable papers and effects of the decedent, or was lodged in the hands of some person for safe-keeping."
It will be noted that to make a valid holograph will it is necessary (1) that it must appear on the oath of some one of the witnesses or of some other credible person, that such will was found among the valuable papers and effects of the decedent or was lodged in the hands of some person for safe-keeping.
In In re Westfeldt, 188 N.C. 702 (709), it is written: "`Valuable papers consist of such as are regarded by a decedent as worthy of preservation, and therefore in his estimation, of some value; depending much upon the condition and business and habits of the decedent in respect to keeping his valuable papers.' Winstead v. Bowman, 68 N.C. 170. `What is meant by valuable papers? No better definition perhaps, can be given, than that they consist of such as are regarded by the testator as worthy of preservation, and, therefore, in his estimation, of *Page 267 
some value. It is not confined to deeds for land or slaves, obligations for money, or certificates of stock. Any others which are kept and considered worthy of being taken care of by the particular person, must be regarded as embraced in that description. This requirement is only intended as an indication on the part of the writer, that it is his intention to preserve and perpetuate the paper in question as a disposition of his property; that he regards it as valuable.' Marr v. Marr, 39 Tenn. 306. . . . Ashe, J., inBrown v. Eaton, 91 N.C. p. 30, said: `Where a person has two or more depositories of his valuable papers and effects, the finding in either will suffice. It is not necessary it should be found in that which contains the most valuable papers and effects. Winstead v. Bowman, 68 N.C. 170.' Hillv. Bell, 61 N.C. 122; Hughes v. Smith, 64 N.C. 493; Cornelius v.Brawley, 109 N.C. 542; In re Sheppard's Will, 128 N.C. 54; Harper v.Harper, 148 N.C. 453." In re Will of Groce, 196 N.C. 373 (375-6); Dulinv. Dulin, 197 N.C. 215 (220).
The purported will was found in a drawer — washstand or bureau — in the home of C. R. Williams. "The drawer that he kept his papers in." In the drawer was a bunch of deeds, four or five, and receipts, etc. We think the evidence was sufficient to have been submitted to the jury as to whether the purported will "was found among the valuable papers andeffects of the deceased." In re Will of Shemwell, 197 N.C. 332.
(2) It must appear "on the oath of at least three credible witnesses, who state that they verily believe such will and every part thereof is in the handwriting of the person whose will it purports to be, and whose name must be subscribed thereto, or inserted in some part thereof."
J. Will Higgins testified, in part: "Well, I think I know the handwriting of C. R. Williams. I have often seen him write. To the best of my knowledge that paper, the signature to it and the body of it is in Neely Williams' handwriting." The testimony of Richmond Bennett, Daisy Williams and Mr. Scott was to the same effect. "A credible witness is one who is competent to give evidence; also one who is worthy of belief." Black's Law Dictionary, 3rd Ed., p. 475.
The purported will was a natural one. The widow — the primary object of the testator's bounty — was given the personal property "to use as her own" and a life estate in the real estate. At her death the real estate to be divided equally between Brown Williams and Coy Williams, who were practically raised by C. R. Williams and his wife, who had no children. The sisters of C. R. Williams, Charlotte Byrd and Jane Taylor, in their answer say "That the paper writing filed with the clerk of the court is the true and proper will of Cornelius R. Williams and each and every part of said will is in his own handwriting. . . . "As he in his life-time informed these respondents of his intention to leave *Page 268 
his property just exactly as set out in the will. That he had sufficient mental capacity to execute the same and that the same and every part thereof is his last will and testament." The answer of W. D. Adkins, guardian of the minor children, is to the same effect and further, "And this answer is the only answer that said guardian ad litem can in goodconscience file in said cause." The answer of the guardian ad litem was filed after an investigation. The only real contestant seems to be W. H. Williams.
There was no probative evidence that the testator was not of sound and disposing mind and memory, and the only questions seriously presented in the trial below were as to the paper writing being in the handwriting of the deceased and the place where it was found. We see no error in the propounders introducing in evidence the paper writing purporting to be the will of C. R. Williams and marked "Propounders Exhibit `A,'" or the record admitting probate solely to show it was probated in common form.
It is well settled that the probate of a will in common form is incompetent as evidence of its validity on an issue of devisavit vel non, raised by a caveat filed to said will. Wells v. Odum, 205 N.C. 110. N.C. Code, supra, sec. 1784, provides for the proof of handwriting by comparisons; this section is interpreted in Newton v. Newton, 182 N.C. 54. We do not think that the above statute was impinged. The cross-examination of John P. Lyon, witness for propounders, by the propounders, was in the discretion of the trial judge. The court below charged the jury: "The propounder, Mrs. Daisy Williams, has offered the testimony of three persons, in addition to herself, who have testified that they are familiar with the handwriting of the deceased, and have compared the paper writing purporting to be the will with other writing which the evidence tends to show is the handwriting of the deceased, and all have given it as their opinion that the paper writing and every part thereof is in the handwriting of the deceased, C. R. Williams."
After quoting the above portion of the charge, "the caveators insist that the court erred in giving its opinion in the trial of the cause." But the court, prior to the above excerpt, went into detail citing caveators' testimony and, taking the charge as a whole, we can see no expression of opinion as is prohibited by C. S., 564.
The caveators contend: "That the court erred in its charge to the jury concerning the requisites necessary to the probate of a will in solemn form, in that he stated, `Now to make the case as plain as possible, the court instructs you again if you find, and find by the greater weight of the evidence, the burden being on Mrs. Williams, the propounder, that *Page 269 
the paper writing was found among the valuable papers of C. R. Williams and that the name subscribed thereto, or inserted in some part thereof, was in the handwriting of the deceased, Mr. C. R. Williams, then I instruct, gentlemen of the jury, as a matter of law, upon that finding by the greater weight of the evidence, it would be your duty to answer the issue, `Yes.'"
Theretofore the court below had charged, "Now our statute (sec. 4131) defines very clearly what must be done before one can prove a last will," etc. The statute is set forth in the charge.
The court explained the law and gave fully the contentions of the caveators in every detail: "So the court instructs you that whether you shall or shall not find that the purported signature at the bottom is that of Mr. Williams, that if you find that the name appearing at the top of the paper writing is in his handwriting, then in that phase of the case that would be sufficient; however, in that connection the court also instructsyou that the paper writing and every part thereof must be in thehandwriting of the deceased, and before you could answer the issue in favorof the propounders you must find, and find by the greater weight of theevidence, that the paper writing and every part thereof purporting to behis will is in the handwriting of C. R. Williams." (Italics ours.)
The court goes on, as to the will being found among the valuable papers and effects, and finally charges: "Now, gentlemen, I reiterate again as to the instructions given at the beginning of the charge, in stating the evidence offered by each side, and in stating the contentions given by each side the court doesn't intend to express or intimate any contention or evidence or intimate an expression on the part of the court as to whether any fact has or has not been proven, and if you find any act or expression of the court in favor of either side I instruct you that it is a mistake, the court has nothing to do with that, the finding of facts is a matter for the jury to determine. (Now to make the case as plain as possible, the court instructs you again, if you find and find by the greater weight of the evidence, the burden being on Mrs. Williams, the propounder, that the paper writing was found among the valuable papers of Mr. C. R. Williams, and that the name subscribed thereto and inserted in some part thereof was in the handwriting of the deceased, Mr. C. R. Williams, then I instruct you, gentlemen of the jury, as a matter of law that upon that finding by the greater weight of the evidence it would be your duty to answer the issue, `Yes.') If, however, you do not so find, that is, if the propounders have failed to carry the burden imposed upon them by law and have not satisfied you by the greater weight of the evidence of sufficient facts to justify you in making *Page 270 
that finding, then, gentlemen of the jury, it would be your duty to answer the issue, `No.'"
The above portion of the charge in parenthesis was excepted to and assigned as error. We cannot so hold. Taking the prior charge and this portion, there is no such conflict that could not be reconciled. On the whole charge we see no prejudicial or reversible error. The charge must be construed as a whole. We see no error in the "further charge" or the refusal to give the following prayer for instruction made by the caveators, viz.: "The court charges the jury that it is the duty of the jury upon all the evidence to answer the issue submitted, `No.'"
Taking the entire record it seems that the heirs and widow of C. R. Williams, with the exception of caveators, were satisfied with the will in every respect. The jury has reached the same conclusion as the propounders, after a careful trial of the case free from prejudicial or reversible error.
In the judgment we find
No error.